# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DICK ANTHONY HELLER** ) | |
| 263 Kentucky Ave., SE ) | |
| Washington, DC 20003 ) | |
| ) | |
| **CHARLES W. NESBY** ) | |
| 1600 South Eads Street Apt. 824N ) | |
| Arlington, Virginia 22202 ) | |
| ) | |
| **HELLER FOUNDATION** ) | |
| 263 Kentucky Ave., SE ) | |
| Washington, DC 20003 ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 22-cv-1894 |
| ) | |
| **DISTRICT OF COLUMBIA,** ) | |
| Serve: Mayor Muriel Bowser ) | |
| 1350 Pennsylvania Avenue, NW ) | |
| Washington, DC 20004 ) | |
| ) | |
| c/o Office of Attorney General ) | |
| 1 Judiciary Square ) | |
| 441 4th Street, N.W., 6th Fl. South ) | |
| Washington, D.C. 20001 ) | |
| ) | |
| and ) | |
| ) | |
| **CHIEF ROBERT J. CONTEE III** ) | |
| Metropolitan Police Department ) | |
| 300 Indiana Avenue, N.W. ) | |
| Washington, DC 20004 ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF AND DAMAGES

COME NOW the Plaintiffs, Dick Anthony Heller, Charles W. Nesby, and Heller

Foundation, by and through their undersigned counsel, and complain of the Defendants as follows:

**THE PARTIES**

1.      Plaintiff Dick Anthony Heller is a natural person and a citizen of the United States and of the District of Columbia. He holds a Concealed Pistol Carry License issued by the Chief of the Metropolitan Police Department ("MPD"). He regularly carries a concealed firearm for personal protection within the District. He regularly carries a Charter Pathfinder revolver, the ammunition capacity of which is  six rounds. Mr. Heller is President of the Heller Foundation.

2.      Plaintiff Charles W. Nesby is a natural person and a citizen of the United States and of the Commonwealth of Virginia. He holds a Concealed Pistol Carry License issued by the Chief of the Metropolitan Police Department ("MPD"). He regularly carries a concealed firearm for personal protection within the District. He regularly carries a Springfield XDS pistol for personal protection, which is a semi-automatic pistol with an ammunition capacity of one round in the chamber and six rounds in the magazine. Mr. Nesby is an NRA handgun instructor and a Maryland State Police certified handgun instructor.

3.      Plaintiff Heller Foundation is a 501(c)3 organization dedicated to educating the public on Second Amendment issues and protecting Second Amendment liberties. It has contributors in the District of Columbia and other jurisdictions who have D.C. concealed pistol licenses. The Heller Foundation is joining this action to represent the interests of its contributors who hold D.C. concealed pistol licenses.

4.      Defendant District of Columbia is a municipal entity organized under the Constitution and laws of the United States. It is the seat of government of the United States. Article I, Section 8 of the Constitution gives Congress plenary authority to make laws governing the seat of government of the United States. Congress has chosen to delegate much of its power to make laws for the governing of the District of Columbia to the mayor and city council of the District.

5.     Defendant Robert J. Contee III is the Chief of the District of Columbia's Metropolitan Police Department ("MPD"). Defendant Contee is responsible for executing and administering the District of Columbia's laws, customs, practices, and policies at issue in this lawsuit; has enforced the challenged laws, customs and practices against Plaintiffs, and is in fact presently enforcing the challenged laws, customs and practices against Plaintiffs. Defendant Contee is sued in both his individual and official capacities.

**JURISDICTION AND VENUE.**

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983 and § 1988.

7.     Venue lies in this Court pursuant to 28 U.S.C. § 1391.

**STATEMENT OF FACTS.**

**The Second Amendment.**

8.     The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

9.     The Second Amendment guarantees the People of the United States a fundamental, individual right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *New York State Rifle and Pistol Association v. Bruen,* __ U.S. __, Case No. 20-843, slip op. (June 23, 2022) (hereinafter "*Bruen*"); *District of Columbia v. Heller*, 554 U.S. 570 (2008) (hereinafter *"Heller"*); *McDonald v. Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts,* 577 U.S. 411 (2016) (hereinafter *"Caetono"*); *Wrenn v. District of Columbia,* 864 F.3d 650 (D.C. Cir. 2017) (hereinafter *"Wrenn"*); *Palmer v. District of Columbia,* 59 F.Supp.3d 173 (D.D.C 2014) (hereinafter *"Palmer"*).

10.     Arms are "'weapons of offence, or armour of defence.' 1 Dictionary of the English Language 107 (4th ed.). They are anything that a man [or woman] wears for his defense, or takes into his hands, or uses in wrath to cast at or strike another.' 1 A New and Complete Law Dictionary (1771)." *Heller*, 554 U.S. at 581.

11.     The Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. *Heller,* 554 U.S. at 582; *Caetano*, slip op. at 1 (per curiam).

12.     Pursuant to the Supreme Court's decision in *Bruen, supra,* and the DC Circuit's decision in *Wrenn*, *supra,* the Second Amendment protects the right of law-abiding citizens to carry a handgun in public for self-protection. A necessary component of the right to carry a firearm is the right to possess and carry ammunition for that firearm. Otherwise, the firearm would be useless as a self-defense tool, other than perhaps as a clubbing weapon. *Cf. Ezell v. City of Chicago,* 651 F.3d 684 (7th Cir. 2011) (the ability to train and practice with a firearm is protected by the Second Amendment).

13.     Under the Second Amendment, the District of Columbia retains the ability presumptively to regulate consistent with the nation's historical tradition of firearms regulation the manner of carrying arms, including handguns, and may prohibit certain arms in narrowly defined sensitive places, prohibit the carrying of arms that are not within the scope of Second Amendment's protection, such as unusually dangerous arms, and disqualify specific, particularly dangerous individuals from carrying arms. *See Bruen, slip. op.* at 13; *Heller,* 554 U.S. at 627. *See Wrenn,* 864 F.3d at 662-63 & n. 5. However, when such regulations impinge on the ability of law-abiding persons to protect themselves and their loved ones, such laws are invalid unless supported

by the text of the Second Amendment or by historical analogues existing at the time of the founding. *Bruen, slip op.* at 13.

14.     Given the decision in *Bruen and Heller*, the District of Columbia may not ban the keeping and bearing of arms for self-defense that are not unusually dangerous, deny individuals the right to carry arms in non-sensitive places, deprive individuals of the right to keep or carry arms in an arbitrary and capricious manner, or impose regulations on the right to keep and carry arms that are inconsistent with the Second Amendment and the historical tradition of firearms regulation in the United States. *Bruen, slip op.* at 13. *See also Caetano*, 577 U.S. 411; *Heller v. District of Columbia,* 801 F.3d 264 (D.C. Cir. 2015); *Wrenn,* 864 F.3d 650; *Palmer,* 59 F.Supp.3d 173.

15.     The regulation at issue in this case, runs afoul of the Second Amendment because it lacks any historical justification, is arbitrary and capricious, and unnecessarily impinges on the core right of self-protection. Moreover, to the extent any continuing validity exists of the interest balancing test adopted by the D.C. Circuit in *Heller v. District of Columbia,* 670 F.3d 1244 (D.C. Cir. 2011) – and we suggest there is not – the regulation at issue herein is not justified by an articulated compelling or substantial governmental interest, and lacks sufficient tailoring to achieve whatever governmental interest, if any, might exist to otherwise support it.

**District law.**

16.     Following the issuance of *Palmer*, the District of Columbia enacted a detailed scheme that restricted the public carrying of handguns to persons who are issued licenses to carry concealed pistols.[1]  *See* DC Code Section 22-4504(a) ("No person shall carry within the District

---

[1] DC Code Section 7-2505.01(12) defines the term "pistol" as "any firearm originally designed to be fired by use of a single hand or with a barrel less than 12 inches in length." Generally, in usage, the term "pistol" refers to a handgun having one chamber integral with the barrel, making pistols

of Columbia either openly or concealed on or about their person, a pistol, without a license issued

pursuant to District of Columbia law, or any deadly or dangerous weapon."). The MPD Chief was

given discretion to issue carry licenses to persons who could show good cause and otherwise meet

detailed eligibility requirements. *See* DC Code Section 22-4506(a), which provided:

> The Chief of the Metropolitan Police Department ("Chief") may, upon the
> application of a person having a bona fide residence or place of business within the
> District of Columbia, or of a person having a bona fide residence or place of
> business within the United States and a license to carry a pistol concealed upon his
> or her person issued by the lawful authorities of any State or subdivision of the
> United States, issue a license to such person to carry a pistol concealed upon his or
> her person within the District of Columbia for not more than 2 years from the date
> of issue, if it appears that the applicant has good reason to fear injury to his or her
> person or property or has any other proper reason for carrying a pistol, and that he
> or she is a suitable person to be so licensed.

17.     Under this provision, some 123 carry licenses were issued between the date of

enactment of Section 22-4506, and the decision of the Court of Appeals in *Wrenn.* Pursuant to

*Wrenn*, the District became what is known as a shall issue jurisdiction, meaning that upon an

applicant meeting objective qualifications criteria, the Chief was required to issue a license to carry

a handgun to the applicant unless the Chief had information indicating the applicant was otherwise

not suitable to carry a handgun, for example, that he presented a danger to himself or others. Such

objective criteria include meeting the requirement to take 16 hours of classroom training and two

hours of range training from an MPD licensed concealed carry instructor, passing a 50 round

shooting test administered by the instructor, passing a background check, and not being a person

---

distinct from the other main type of handgun, the revolver, which has a revolving cylinder
containing multiple chambers. Most handgun experts and dictionaries make a technical distinction
that views pistols as a subset of handguns. The District uses the term pistol to refer to all handguns,
however. For the sake of clarity, this complaint will use the term "handgun" to refer to both pistols,
revolvers and other weapons coming within the term "pistols" as defined by District law.

prohibited from possessing firearms and ammunition under federal or District law. *See* DC Code Section 7-2509.02.

18.     Based upon MPD's response to a Freedom of Information Act request as of August 29, 2019, the District had issued 3339 carry licenses. *See* Response to FOIA Request, 2019-FOIA-05038. On information and belief, the District has issued several thousand more carry licenses since August of 2019.

19.     The District has adopted strict regulations on the carrying of handguns. For example, District law substantially limits where handguns may be carried. *See* DC Code 7-2509.07. Quoting from Code Section 7-2509.07, handguns may not be carried in the following places or in the following circumstances:

**(1)** A building or office occupied by the District of Columbia, its agencies, or instrumentalities;

**(2)** The building and grounds, including any adjacent parking lot, of a childcare facility, preschool, public or private elementary or secondary school; or a public or private college or university;

**(3)** A hospital, or an office where medical or mental health services are the primary services provided;

**(4)** A penal institution, secure juvenile residential facility, or halfway house;

**(5)** A polling place while voting is occurring;

**(6)** A public transportation vehicle, including the Metrorail transit system and its stations;

**(7)** Any premises, or portion thereof, where alcohol is served, or sold and consumed on the premises, pursuant to a license issued under Title 25; provided, that this prohibition shall not apply to premises operating under a temporary license issued pursuant to § 25-115, a C/R, D/R, C/H, D/H or caterer license issued pursuant to § 25-113, or premises with small-sample tasting permits issued pursuant to § 25-118, unless otherwise prohibited pursuant to subsection (b)(3) of this section;

**(8)** A stadium or arena;

**(9)** A gathering or special event open to the public; provided, that no licensee shall be criminally prosecuted unless:

> **(A)** The organizer or the District has provided notice prohibiting the carrying of pistols in advance of the gathering or special event and by posted signage at the gathering or special event; or

> **(B)** The licensee has been ordered by a law enforcement officer to leave the area of the gathering or special event and the licensee has not complied with the order;

**(10)** The public memorials on the National Mall and along the Tidal Basin, and any area where firearms are prohibited under federal law or by a federal agency or entity, including U.S. Capitol buildings and grounds;

**(11)** The White House Complex and its grounds up to and including to the curb of the adjacent sidewalks touching the roadways of the area bounded by Constitution Avenue, N.W., 15th Street, N.W., H Street, N.W., and 17th Street, N.W.;

**(12)** The U.S. Naval Observatory and its fence line, including the area from the perimeter of its fence up to and including to the curb of the adjacent sidewalks touching the roadway of Observatory Circle, from Calvert Street, N.W., to Massachusetts Avenue, N.W., and around Observatory Circle to the far corner of Observatory Lane;

**(13)(A)** When a dignitary or high-ranking official of the United States or a state, local, or foreign government is moving under the protection of the MPD, the U.S. Secret Service, the U.S. Capitol Police, or other law enforcement agency assisting or working in concert with MPD, within an area designated by the Chief, the Chief of the U.S. Secret Service, or the Chief of the U.S. Capitol Police, or a designee of any of the foregoing, that does not include any point at a distance greater than 1,000 feet from the moving dignitary or high-ranking official; provided, that no licensee shall be criminally prosecuted unless:

> **(i)** The law enforcement agency provides notice of the designated area by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to make the designated area of protection obvious;

> **(ii)** The District or federal government has provided notice prohibiting the carrying of pistols along a designated route or in a designated area in advance of the event, if possible, and by posted signage along a route or in a designated area; or

> **(iii)** The licensee has been ordered by a law enforcement officer to leave the designated area and the licensee has not complied with the order.

**(B)** For the purposes of this paragraph, the term "moving" shall include any planned or unplanned stops, including temporary stops, in locations open to the public.

**(14)** When a demonstration in a public place is occurring, within an area designated by the Chief or his or her designee, or other law enforcement agency, that does not include any point at a distance greater than 1,000 feet from the demonstration; provided, that no licensee shall be criminally prosecuted unless:

> **(A)** The law enforcement agency provides notice of the designated area by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to make the designated area of the demonstration obvious;
>
> **(B)** The District or federal government has provided notice prohibiting the carrying of pistols along or within a demonstration route or designated area in advance of the event, if possible, and by posted signage along a demonstration route or designated area; or
>
> **(C)** The licensee has been ordered by a law enforcement officer to leave the designated area and the licensee has not complied with the order; …

**(15)** Any prohibited location or circumstance that the Chief determines by rule; provided, that for spontaneous circumstances, no criminal penalty shall apply unless the licensee has notice of the prohibition and has failed to comply.

20.     In addition, Code Section 7-2509.07(b) provides that carrying a handgun into the residence of another is presumed prohibited unless authorized in advance by the owner or person in control of the property. Code Section 7-2509.07(b)(1). A similar provision presumes that carrying a handgun into a house of worship is prohibited unless signage allows it, or the licensee is provided permission personally in advance. DC Code Section 7-2509.07(b)(2). Under DC Code Section 7-2509.07(b)(3), it is presumed that a licensee has permission to carry in and on other non-residential property unless conspicuous signage prohibits handgun carry or the licensee has been personally told not to carry on the property.

21.     These are so-called sensitive places regulations. In dicta, *Heller* designated schools and government buildings as presumptively sensitive areas where carrying firearms could be

restricted. *Heller,* 554 U.S. at 626. *See also Bruen, slip op.* at 26. In *U.S. v. Class,* 930 F.3d 460, 463 (D.C. Cir. 2019) the court noted that "A challenger may rebut this presumption by 'showing the regulation [has] more than a de minimis effect upon his right' to bear arms. *Heller[v. District of Columbia],* 670 F.3d [1244,] 1253 [D.C. Cir. 2011]."

22.     The District by regulation requires that pistol carry licensees must carry their guns fully concealed. DCMR 24-2344.1 states: "A licensee shall carry any pistol in a manner that it is entirely hidden from view of the public when carried on or about a person, or when in a vehicle in such a way as it is entirely hidden from view of the public."

23.     Moreover, pursuant to DC Code Section 7-2509.11(2), the MPD Chief was authorized to promulgate rules "To establish the type and amount of ammunition that may be carried concealed by a licensee" holding a concealed pistol license. The Chief did so via DCMR 24-2343. DCMR 24-2343.2 prohibits carry of restricted pistol ammunition, otherwise known as armor piercing ammunition, which is illegal to possess in the District. *See* DC Code Section 7-2506.01(3) and 7-2501.01(13)(A)(A) (defining restrictive pistol bullet). Plaintiffs do not challenge this regulation.

24.     Plaintiffs, however, do challenge DCMR 24-2343.1. As originally adopted via a *Notice of Emergency and Proposed Rulemaking* ("*Emergency Notice*") on October 31, 2014, this regulation provided, "A person issued a concealed carry license by the Chief, while carrying the pistol, shall not carry more ammunition than is required to render the pistol fully loaded, and in no event shall that amount be greater than ten (10) rounds of ammunition." *See* N0050304, 61 DRC 11519. The emergency regulation was adopted without any discussion of the substance of this

particular regulation or justification of the limitations set forth therein.[2] Apparently, it was the arbitrary determination of the Chief.

25.     Subsequently on March 6, 2015, the Chief issued a *Notice Of Second Emergency And Proposed Rulemaking*, N0051986, 62 DCR 2803, which without comment or explanation, doubled the allowable ammunition a concealed pistol licensee could carry on his person. This regulation read, "A person issued a concealed carry license by the Chief, while carrying the pistol, shall not carry more ammunition than is required to fully load the pistol twice, and in no event shall that amount be greater than twenty (20) rounds of ammunition."

26.     The Chief adopted the final rule via a *Notice of Final Rulemaking*, N0054222, issued July 17, 2015, 62 DCR 9781, again without comment or explanation regarding DCMR 24-2343.1, which was unchanged from the second emergency proposed rulemaking.

27.     *Bruen, Heller* and *Wrenn* require us to evaluate firearm regulations in light of the text, history and tradition of the Second Amendment. *Bruen, slip op.* at 13; *Heller,* 554 U.S. at 576-628*; Wrenn,* 864 F.3d at 657-61*; See also Moore v. Madigan,* 702 F.3d 933, 935-37 (7th Cir. 2012), *reh'g en banc denied*, 708 F.3d 901 (7th Cir. 2013). There appears to be nothing in the text,

---

[2] The *Emergency Notice* did state without specifically identifying that,

> [s]ome of the standards the Chief will use to consider license applications were established in the Act by the Council of the District of Columbia (Council). The Council derived the standards found in similar "may issue" handgun licensing or permitting schemes in the States of Maryland (good and substantial reason standard), New Jersey (justifiable need standard), and New York (proper cause standard). All of these schemes have been sustained as constitutional by U.S. Courts of Appeals. Additionally, some of the standards in these regulations have been adapted from the above states and earlier MPD regulations. Many of the application and investigation procedures were adapted from Maryland regulations.

As we discuss herein, neither New York, New Jersey nor Maryland law contains an analog to DCMR 24-2343.1. Indeed, it is apparent that DCMR 24-2343.1 has no analog among the laws of any state in the union nor does any historical analog exist to justify this regulation.

history or tradition of the Second Amendment that supports limiting the amount of ammunition that a person may carry for his or her self-defense.

28.     As stated above, District regulations require pistol carry licensees to carry their firearms fully concealed. Violation of this regulation is grounds for revocation of the carry license and carries a potential criminal penalty. *See* DC Code Section 7-2509.10(a)(1).[3]

29.     Smaller, lower capacity handguns are substantially easier to conceal than larger, higher capacity handguns, especially for women whose clothing options sometimes render concealed handgun carry problematic. *See generally, Concealed Carry Corner: Small Guns – The Good, The Bad and the Ugly,* The Firearms Blog (November 19, 2019). Because of this, smaller handguns are popular among persons holding District concealed pistol licenses. *See* Declaration of MPD Licensed Firearm Instructor Mark A. Briley. Various manufacturers specifically market small pistols for the concealed carry community. *See, e.g., Top Smallest Pistols on Brownells* (April 27, 2022), available at https://thegunzone.com/top-smallest-pistols-on-brownells/;[4]

---

[3] The ramifications of violating the requirement that the firearm must be fully concealed are enormous. The District of Columbia Code provides for a potential jail term of up to six months and a fine of up to $1000 for such violation. *See* DC Code Sections 7-2707.06(a) and 22-3571.01(b)(4).

Moreover, conviction "in any jurisdiction of any law which involves the sale, purchase, transfer in any manner, receipt, acquisition, possession, having under control, use, repair, manufacture, carrying, or transportation of any firearm, ammunition, or destructive device" is defined as a "weapons offense." DC Code Section 7-2501.01(18). Conviction of a weapons offense – with very minor exceptions not pertinent here – by a DC resident renders that person ineligible for life to register or carry a firearm, thus stripping him of his firearms rights in the District. *See* DC Code Section 7-2502.03(a)(2). Under such circumstances, no DC conceal carrier is likely to intentionally expose his firearm and risk losing his firearms rights in the District. We note that MPD actively enforces this provision.

[4] Among the firearms mentioned in the article are: the Kahr P380 with a capacity of 7 rounds, 6 in the magazine and 1 in the chamber; the Glock 42, 6+1 capacity; Colt Mustang, 6+1 capacity; M&P Shield, 8+1 capacity; Diamondback Arms DB380, 6+1 capacity; Kel-Tec PF-9, 7+1 capacity; Beretta Nano, 6+1 capacity; and Tauris 709FS, 7+1 capacity.

Fitzpatrick, *The Best Concealed Carry Handguns in 2021,* American Firearms (January 29, 2021), available at https://www.americanfirearms.org/best-concealed-carry-guns/.[5]

30.     The regulation here at issue limits a licensed concealed carrier to the amount of ammunition that would load his gun twice, but no more than 20 rounds total. The regulation at issue unduly burdens Plaintiffs and other persons possessing a District of Columbia concealed pistol license. The burden is particularly harsh as to persons like the Plaintiffs in this case who choose to carry smaller, more concealable firearms holding limited amounts of ammunition due to the small size of the gun.

31.     There are two ways to stop a deadly force attack. The first is to persuade the attacker to stop. This could potentially be accomplished through verbal persuasion such as an appeal to morality and humanity; however, in the real world once someone has committed to the use of deadly force in the commission of a violent crime, he is not likely to be talked out of it. A more likely means of persuasion is the threat or application of deadly force in response. Hence, most crimes which are stopped by armed citizens do not require the firing of a single shot. Similarly, an assailant who has been shot at or hit may decide he has made a grievous error in the victim selection process and break off the attack.

32.     Not all criminals, however, are persuadable. To stop those criminals, it is necessary to incapacitate them before they can inflict serious bodily harm or death. This can be done by causing sufficient trauma and blood loss so that the attacker loses consciousness. Handgun bullets, however, are rather weak for this purport as has been documented by numerous officer involved shootings.

---

[5] In addition to many of the guns discussed in note 4, supra, the article mentions: the Ruger LCP II, 6+1 capacity; the Ruger LCR, a 5 shot revolver; the Smith & Wesson Airweight, also a 5 shot revolver; Walther PPK, 6+1 capacity; and PPK/s, 7+1 capacity.

33.     For example, Jacksonville Police Officer Jared Reston fired 14 shots in attempting to stop a shoplifter who carried a handgun chambered in .45 caliber, one of the larger pistol bullets. The suspect shot Reston once in the face and proceeded to fire 11 more rounds, six of which struck Reston who survived the gun fight. Reston managed to hit the suspect seven times, ending the fight with a final shot to the suspect's head. *See* Wallace, *Shots Fired: Jared Reston Survival and Gear*, Recoil Magazine (December 6, 2019), available at https://www.recoilweb.com/shots-fired-jared-reston-survival-gear-154993.html. *See also* Purkiss, Locked Back, *Lessons from Jered Reston's Gun Fight – Shot 7 Times & Still Won* (December 20, 2017), available at https://lockedback.com/lessons-jared-restons-gunfight-shot-7-times-still-won/.

34.     Noted police and civilian firearms instructor and use of force expert Massad Ayoob illustrates this point with two shooting incidents, one involving a civilian and the other involving a law enforcement officer:

> Famed Los Angeles watch shop owner Lance Thomas was involved in multiple gun battles with armed robbers, winning every one. In one of those incidents, he had to fire 19 rounds before the last of his multiple opponents was out of the fight. Some bad guys can soak up an unbelievable amount of lead, and the cunning ones run and use cover, making them harder to hit and requiring more shots to stop them.
>
> A municipal police sergeant in northern Illinois, Tim Gramins, comes to mind. He pulled over a heavily armed suspect who came out shooting, and the fight was on. In just under a minute, the perpetrator was finally down and dead. During that time, Gramins had fired 33 rounds from his Glock 21 pistol, reloaded as necessary and hit his opponent 14 times with 230-grain Gold Dot .45 bullets. Six of those hits were in what most of us would call "vital zones," but the fight wasn't over until Gramins finally had the opportunity for brain shots. During that fight the suspect had gone through two semi-automatic pistols himself and had fired 21 shots.

Ayoob, *5 Gun Fighting Myths Debunked by Massad Ayoob*, Personal Defense World (October 14, 2014), available at https://www.personaldefenseworld.com/2014/10/5-gunfighting-myths-debunked-massad-ayoob/.

35.     Wisconsin officer Brian Murphy was shot 15 time by a mass murdering white supremist. Only three of those rounds were stopped by his body armor. Other shots hit him in the face, throat, both hands, both arms and both legs. Despite these grievous injuries, he survived. *See* Ayoob, *Shot 15 Times: The Brian Murphy Story*, American Handgunner (2018), available at https://americanhandgunner.com/our-experts/shot-15-times-the-brian-murphy-story/.

36.     In commenting on another incident in which a suspect was shot 17 times with both .40 caliber 180 Gr. Gold Dot hollow point pistol rounds and .223 Hornady TAP rifle rounds and was still struggling with police as he was being handcuffed, a report of the FBI's Defensive Systems Unit – Ballistic Research Facility, FBI Academy, stated,  "Determined individuals can sustain many gunshot wounds in areas that produce great pain and continue to fight a long time, even without the aid of drugs or alcohol. Shot placement is everything in a gunfight and always the key to stopping a threat effectively." FBI, *Officer Involved Shooting*, available at https://info.publicintelligence.net/FBIAAROfficerShooting.pdf.  In that gun fight, two officers fired a total of 107 rounds. The suspect fired 26 rounds, reloading his magazine from a box of loose ammunition. *Id.*

37.     Perhaps one of the more influential gun fights, which has since profoundly affected doctrine on gun selection and ammunition caliber and quantity, is the 1986 FBI Miami shootout. *See generally,* Mireles, *FBI Miami Firefight: Five Minutes that Changed the Bureau* (2017). In that incident two bank robbers shot it out with a team of FBI agents. "Early in the fight, a bullet from [FBI agent Jerry] Dove's 9mm pistol pierced the opposing rifleman's arm and into his chest, slicing an artery and inflicting a 'fatal, but not immediately neutralizing' hit when it stopped short of his heart. It was after that, that he [the bank robber] inflicted most of the deadly damage." Ayoob, *A Sad And Meaningful Anniversary*, Backwoods Home Magazine (April 11, 2016),

available at https://www.backwoodshome.com/blogs/MassadAyoob/a-sad-and-meaningful-anniversary/. The assailant would go on to take five more hits from the agents' guns until Agent Edmundo Mireles killed him with a shot to the head. Two FBI agents died and five were seriously wounded in that incident.

38.     These various incidents and many others present the reality of firearms and ammunition count in self-defense. One can never know how many rounds are sufficient to stop a determined opponent. Even a shot in the face is no guarantee that it will incapacitate an opponent.[6] In a video presentation, Officer Reston explained that on the Jacksonville, Florida Department, he and two other officers had been shot in the face, but each went on to prevail against their assailants. *See* Reston, *Winning an Armed Encounter* (December 4, 2017), available at https://www.youtube.com/watch?v=jIx0Y25aTfU. Limits on ammunition such as the District has adopted here bear almost no relationship to reality.

39.     The Chief's rule imposes a severe and substantial infringement on the ability of Plaintiffs to use their preferred self-defense firearms for the lawful protection of themselves and others. This is especially the case in which a licensed concealed carrier might be set upon by multiple assailants as is the case for residents of those neighborhoods in the District where gangs are prevalent. *See, e.g.,* Johnston, *Wolfpack-Multiple Assailants,* Police Law Enforcement Solutions (November 1, 1996), available at https://www.policemag.com/338649/wolf-pack-multiple-assailants#:~:text=There%20is%20considerable%20empirical%20evidence%20to%20support%20the,can%20result%20in%20serious%20bodily%20injury%20or%av20death. *See also* Samson, *4*

---

[6] Head shots are generally considered to be fight stoppers because a shot to the brain likely will shut down the attacker. By definition, a shot to the head is aimed at a small target, compared to a center mass shot, and requires considerably more skill in a life-or-death situation.

*arrested, including 15-year-old, for brutal attack on Chinese PhD student near UW-Madison*, Yahoo News (June 21, 2022), available at https://news.yahoo.com/4-arrested-including-15-old-174154164.html?fr=sycsrp_catchall; Ayoob, *Lead and diamonds: the Richmond jewelry store shootout.* *(The Ayoob Files)* (2003), available at https://www.thefreelibrary.com/Lead+and+diamonds%3A+the+Richmond+jewelry+store+shootout.+(The+Ayoob...-a099130342.

40.     The District places Plaintiffs in the predicament of choosing smaller, and typically less effective guns, because of their concern with complying with the requirement to fully conceal their guns. But smaller guns are equally subject to the limit on ammunition. Plaintiff Heller is limited by the DCMR 24-2343.1 to only 12 rounds for his small six-shot revolver, six in his gun and another six to reload the gun once. Plaintiff Nesby is limited to 13 rounds for his Springfield XDS pistol, which is deemed "subcompact" by the firearms industry. By contrast, someone carrying a larger but less concealable firearm such as a Glock 17, 19 or 26 may carry a total of 20 rounds. Plaintiffs can contemplate no rational basis why the capacity of ones gun should determine the amount of ammunition he or she can carry to protect his or her life. And of course, rational basis is not the test for the Constitutionality of restrictions on Second Amendment freedoms. The Chief's rule is simply arbitrary, as is the ultimate limit of 20 rounds which Plaintiffs Heller and Nesby cannot carry due to the limited capacity of their chosen concealable handguns.

41.     We note that District police officers are mandated to carry 52 rounds for their self-defense when on duty in their Glock 17 pistols: one in the chamber, a full magazine of 17 rounds, and two additional full 17 round magazines.[7] What is good for MPD officers, however, is

---

[7] *See* MPD General Order RAR-901.01 (Handling of Service Weapons) at 4 (June 12, 2008). Unlike MPD officers, District citizens are limited to 10 round low-capacity magazines, rather than the standard capacity magazines that come stock with most semi-automatic pistols such as the

forbidden to the D.C. residents and out of state persons who hold D.C. concealed pistol license holders. Yet, those license holders have undergone rigorous training and background checks which are among the most demanding in America. Further license holders by virtue of their own conscientiousness, choose smaller guns not for the sake of their own defense, but in an effort to ensure compliance with the District's laws.

**DCMR 24-2343.1 lacks any historic analogue**.

42.     Plaintiffs are unaware of any founding era limitations on the amount of ammunition a person could carry to defend himself from an assailant. Certainly, the Chief pointed to no such historical traditional limit in prescribing a 20 round/one reload limitation in any of the proposed rulemakings or in the final rule adopting DCMR 24-2343.1.

43.     What regulations did exist around the time of the founding of the Second Amendment required Americans to be armed as detailed above and required militia members to be equipped with a *minimum* amount of ammunition. Section 1 of The Second Militia Act required,

> That every citizen so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch with a box therein to contain not less than twenty-four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball: or with a good rifle, knapsack, shot-pouch and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder; and shall appear, so armed, accoutred and provided, when called out to exercise, or into service, except, that when called out on company days to exercise only, he may appear without a knapsack.

Militia Act of 1792 (May 8, 1792).

---

Glock 17 (17 round capacity standard magazine) or the Glock 19 (15 round capacity standard magazine). This limitation raises grave Constitutional issues as well but it not the focus of this action. *But see Duncan . Bonta,* Case No. 21-1194, Petition for Writ of Certiorari (February 28, 2022).

44. As the Supreme Court held in *Heller,* the militia consisted of all ordinary citizens capable of taking up arms to defend the nation, able bodied males of a certain age. *See* 554 U.S. at 580. Nothing in the Militia Act appears to have limited a militia member from possessing more than the minimum amount of required ammunition. And of course, nothing in the Militia Act purports to limit the amount of ammunition a militia member could carry outside of militia service.

45. Beyond the Second Militia Act we are aware of no history or tradition of limiting the amount of ammunition that the persons may carry for their self-defense. Certainly, the Chief pointed to none in adopting the regulation in question.

46. Certain hunting regulations generally restrict the number of shotgun shells or rifle rounds allowable in a hunting weapon. However, these are conservation regulations designed to prevent overhunting. As one commentator has explained it,

> At the behest of […] hunters, laws were passed to better regulate hunting in the United States. Laws created bag limits, possession limits, sectioned off certain plots of land as refuges for birds. This is also where we got laws banning the sale of wild game meat (if you have a source of venison that you purchase, it is from a farm.
>
> One set of game laws that rose out of that early movement was magazine capacity limits. The idea was that a recreational hunter would only kill one or two birds out of a flock, it wasn't considered sporting to blast dozens of ducks out of the water. Limiting shotguns to 10 gauge and smaller with only few shells played a big part in ending market hunting for birds.
>
> Many laws and hunting etiquette from those early days has carried over into the 21st Century. One such law is shotgun magazine capacity. In 1935 the first federal law restricting waterfowl hunters to three shots was enacted. As it happened, waterfowl populations began to rebound after an all-time low in the mid-30's.

Willmus, *Why Shotguns Have Plugs (Plus the laws you need to know),* Backfire (November 3, 2021), available at https://backfire.tv/why-shotguns-have-plugs/#:~:text=Plugs%20are%20used%20in%20shotguns%20to%20limit%20the,varies%20depending%20on%20the%20gauge%20and%20magazine%20length.

47.     Plainly, these types of modern hunting regulations have no nexus to the Second Amendment's core protection of armed self-defense; nor are they of founding era vintage as *Bruen* requires. *See Bruen, slip op.* at 30 ("[W]hen it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.' *Heller*, 554 U.S., at 634-635 (emphasis added).")

48.     Since there is no historical analog for limiting the amount of ammunition that can be carried for self-defense, the District's limitation as set forth in DCMR 24-2343.1 is categorically unconstitutional. *See Bruen, slip op.* at 67.

49.     Further evidence that limiting the amount of ammunition one may carry to defend himself and others is lacking in the nations historical tradition of firearms regulation is that no other jurisdiction we can find has imposed a regulation similar to that which the Chief has imposed on District pistol carry license holders. Thus, the outlier status of this regulation further demonstrates its Constitutional weakness. *See Bruen, slip op.* at 68; *Id.* at 78 & 79 (Kavanaugh, J., concurring). *See also Drummond v. Robinson Twp.,* No. 20-1722, 2021 U.S. App. LEXIS 24511, at *22 (3d Cir. Aug. 17, 2021).

50.     In *Heller,* the Supreme Court eschewed balancing tests for evaluating the Constitutionality of regulations burdening the Second Amendment. *Heller,* 554 U.S. at 576-627. The just recently released *Bruen* decision makes is abundantly clear as to the Constitutional test for governmental restrictions on Second Amendment conduct, and the District cannot meet this test with respect to the regulation here at issue:

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's

conduct falls outside the Second Amendment's "unqualified command." *Konigsberg [v. State Bar of California]*, 366 U.S., [36,] 50, n. 10 [(1961)].

*Bruen, slip op.* at 20 (2022).

51.     Accordingly, it would be error for the Court to evaluate the regulation at issue under the means-end tiers of scrutiny approach *Bruen* rejects. *Id.* at 15. Nonetheless, the regulation at issue fails both strict scrutiny as well as the  intermediate scrutiny test *Heller* specifically rejected. *Heller,* 554 U.S. at 634. *See also Heller v. District of Columbia,* "670 F.3d at 1277 (Kavanaugh, J., dissenting). The MPD Chief pointed to no compelling or significant governmental interest in adopting the limitation on the amount of ammunition that may be carried by a licensed pistol carrier, and of course he set forth no discussion of potentially alternative schemes to meet any such governmental interest which would be a lesser burden on Second Amendment rights. In any event, any such interest that the government could point to justify the regulation at issue is outweighed by the burden it imposes on the Second Amendment right of self-defense. For these reasons even if means-ends scrutiny applied – and *Bruen* specially says it does not – the challenged regulation cannot stand.

**FIRST CLAIM FOR RELIEF: U.S. CONST., AMEND. II, 42 U.S.C. § 1983 AGAINST ALL DEFENDANTS.**

52.     DCMR 24-2343.1's prohibition on carrying ammunition in excess of the amount capable of loading the license's gun more than twice, but in no event more than 20 rounds, is not supported by the nation's historical tradition of firearms regulation. As such the rule violates Plaintiffs' Second Amendment rights.

53.     Defendants' regulation limiting the amount of ammunition that Plaintiffs may carry for self-defense violates the Second Amendment to the United States Constitution, facially and as applied against the individual Plaintiffs in this action, damaging Plaintiffs in violation of 42 U.S.C.

§ 1983. Plaintiffs are therefore entitled to preliminary and permanent injunctive relief against DCMR 24-2343.1, and damages for the violation of their Second Amendment rights.

**SECOND CLAIM FOR RELIEF:**

**U.S. CONSTITUTION, AMEND. V, 42 U.S.C. § 1983.**

54.     DCMR 24-2343.1's limitation on the amount of ammunition that Plaintiffs may carry for self-defense is arbitrary and irrational and thus violates the due process clause of the Fifth Amendment to the United States Constitution in light of the Plaintiffs' Second Amendment rights to carry arms for self-defense.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that judgement be entered in their favor and against Defendants as follows:

1.  Enter a declaratory judgement that the DCMR 24-2343.1 is arbitrary and unreasonable under the Second and Fifth Amendments to the United States Constitution;

2.  Enter a declaratory judgement that DCMR 24-2343.1 violates the Second Amendment to the United States Constitution;

3.  Enter an order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing DCMR 24-2343.1within the District of Columbia;

4.  Enter an order awarding Plaintiffs damages in an amount to be determined at trial;

5.  Enter an order awarding Plaintiffs their costs of suit, including attorney fees and costs pursuant to 42 U.S.C. §1988; and

6. Enter an order providing any other and further relief that the court deems just and
appropriate.

Respectfully submitted,

**DICK ANTHONY HELLER**

**CHARLES W. NESBY**

**HELLER FOUNDATION**

By:     /s/ George L. Lyon, Jr.
George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
1929 Biltmore Street NW
Washington, DC 20009
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com

*Attorneys for Plaintiffs*

Dated:   June 30, 2022