IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DICK ANTHONY HELLER, et al.** | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 22-cv-1894 DRF |
| | ) |
| **DISTRICT OF COLUMBIA, et al.** | ) |
| | ) |
| Defendants. | ) |
| ——————————————————— | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR PRELIMINARY INJUNCTION

**DICK ANTHONY HELLER**

**CHARLES NESBY**

**HELLER FOUNDATION**

George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
1929 Biltmore Street NW
Washington, DC 20009
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com

*Attorneys for Plaintiffs*

Dated:  July 11, 2022

# TABLE OF CONTENTS

Table of Authorities ……………………………………………………………………... ii

I.   Plaintiffs have standing to bring this action ………………………………………… 1

II.  Plaintiffs are entitled to a preliminary injunction ……………………..……………… 2

    A.   Plaintiffs are likely to prevail on the merits …………………………..……… 3

        1.   The Second Amendment …………………………………..................... 3

        2.   The statutory scheme …………………………...…………………….... 5

        3.   The challenged regulation lacks support from the nation's historical tradition of firearms regulation and is more than a de minimis burden on armed self-defense; it thus violates the Second Amendment ………... 11

            a.   DCMR 24-2343.1 is a substantial burden on Plaintiffs' right of armed self-defense..……………………………………………… 12

            b.   DCMR 24-2343.1 lacks any foundation in the nation's historical tradition of firearms regulation..…………..…………………….... 18

    B.   Plaintiffs will continue to suffer irreparably harm in the absence of preliminary relief ……………………………………………………………… 22

    C.  The balance of equities tips overwhelmingly in plaintiffs' favor ……………..……. 23

    D.  An injunction is in the public interest ………………………………………… 24

III. The court should waive the bond requirement or set a nominal bond because defendants will suffer no harm from a preliminary injunction ………………….……24

IV.  The court should enter final judgment for plaintiffs …………………………….…… 26

V.   Conclusion …………………………………………………………….....……… 28

Exhibit 1, Declaration of Dick Anthony Heller

Exhibit 2, Declaration of Charles Nesby

Exhibit 3, Declaration of Mark A. Briley

# TABLE OF AUTHORITIES

## Cases

*Aamer v. Obama*,
　　742 F.3d 1023 (D.C. Cir. 2014) ……………………………………..…………..…….. 3

*Ark. Best Corp. v. Carolina Freight Corp.*,
　　60 F.Supp.2d 517 (W.D.N.C. 1999) …………………………………….…………… 25

*Berg v. Glen Cove City School District*,
　　853 F.Supp. 651 (E.D.N.Y. 1994) …………………………………….………… 22

*Caetano v. Massachusetts*,
　　577 U.S. 411 (2016) …………………………………………………………… 3, 4

*Chaplaincy of Full Gospel Churches v. England*,
　　454 F.3d 290 (D.C. Cir. 2006) …………………………………………….……… 22, 23

*Curtis 1000, Inc. v. Suess*,
　　24 F.3d 941 (7th Cir. 1994) …………………………..……………………. 26, 27

*Davis v. District of Columbia*,
　　158 F.3d 1342 (D.C. Cir. 1998) ……………………………………………… 22

**District of Columbia v. Heller*,
　　554 U.S. 570 (2008) …………………………………………….……….. passim

*Doe v. Shenandoah County School Board*,
　　737 F.Supp. 913 (W.D.Va. 1990) …………………………………….……… 22

*Duncan v. Becerra*,
　　970 F.3d 1133 (9th Cir. 2020)*, vacated and reversed en banc* (Nov. 30, 2021)*,*
　　*vacated and remanded sub nom, Duncan v. Bonta*,
　　597 U.S. __, Case No. 21-1194 (June 30, 2022) ……………………………….. 18

*Elrod v. Burns*,
　　427 U.S. 347 (1976) …………………………………………………………… 22

*Ezell v. Chicago*,
　　651 F.3d 684 (7th Cir. 2011) …………………………………….……… 3, 4, 23

*Gordon v. Holder*,
　　721 F.3d 638 (D.C. Cir. 2013) …………………………………………..…. 22, 24

**Denotes principal cases relied upon*

*Heller v. District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) …………………………………..……... 5, 9, 21

*Heller v. District of Columbia,*
    801 F.3d 264 (D.C. Cir. 2015) ……………………………...…………….. 4

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.,*
    174 F.3d 41 1, 421, n.3 (4th Cir. 1999) ……………………………………… 25

*Joynes v. Lancaster,*
    553 F.Supp. 809 (M.D.N.C. 1982) …………………………………..…… 22

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.,*
    710 F.3d 99 (3d Cir. 2013) ………………………………………………… 24

*Konigsberg v. State Bar of California,*
    366 U.S., 36 (1961) ………………………………………………………... 21

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555, 560 (1992) …………………………………………..……… 1

*McDonald v. Chicago,*
    561 U.S. 742 (2010) …………………………………………………………… 3

*Moore v. Madigan,*
    702 F.3d 933 (7th Cir. 2012) *reh'g en banc denied*,
    708 F.3d 901 (7th Cir. 2013)……………………………………….. 11, 23, 27

*Morris v. District of Columbia,*
    38 F. Supp. 3d 57 (D.D.C. 2014) …………………………………………... 26

*\*New York State Rifle & Pistol Association v. Bruen,*
    597 U.S. \_\_, Case No. 20-843, *slip op.* (June 23, 2022) …………………… passim

*Palmer v. District of Columbia,*
    59 F.Supp.3d 173 (D.D.C. 2014) …………………………………….... 4, 5

*Pharm. Soc. of the State of N. Y., Inc. v. N. Y. State Dep 't of Soc Servs.,*
    50 F.3d 1168 (2d Cir. 1995) ……………………………………………... 25

*SEC v. Dowdell,*
    Civil No. 3:01 cv 00116, 2002 U.S. Dist. LEXIS 19980 (W.D. Va., Oct. 11 , 2002) ….. 25

*Temple Univ. v. White,*
    941 F.2d 201 (3d Cir. 1991), *cert. denied*, 502 U.S. 1032 (1992) ………………………… 25

*The Truth About Obama v. Federal Election Commission,*
  575 F.3d 342 (4th Cir. 2009), remanded other grounds, 130 S.Ct. 237 (2010) ………..…. 3

*U.S. v. Class,*
  930 F.3d 460, 463 (D.C. Cir. 2019) ………………………………………………….... 9

*Westfield High Sch. L.I.F.E. Club v. City of Westfield,*
  249 F. Supp.2d 98, 128 (D. Mass. 2003) …………………………………………… 25, 26

*Winter v. National Resources Defense Fund,*
  555 U.S. 7 (2008) ………………………………………………..……… 3, 22

*Wrenn v. District of Columbia,*
  864 F.3d 650 (D.C. Cir. 2017) ………………..…………………….………… passim

**Statutes and Rules**

DC Code Section 7-2501.01(12) ………………………………………...……………. 5

DC Code Section 7-2501.01(13)(A)(A) ……………………………………………… 10

DC Code Section 7-2501.01(18) ………………………………………………….... 12

DC Code Section 7-2502.03(a)(2) ………………………………………………….... 12

DC Code Section 7-2506.01(3) …………………………………………………… 10

DC Code Section 7-2509.02 …………………………………………………...…… 6

DC Code Section 7-2509.07(a) ………….…………………………………………...…. 6

DC Code Section 7-2509.07(b)(1) ……………………………………………… 9

DC Code Section 7-2509.07(b)(2) ……………………………………………… 9

DC Code Section 7-2509.07(b)(3) …………………………………………..……… 9

DC Code Section 7-2509.09.10(a)(1) …………………………………………… 12

DC Code Section 7-2509.09.11(2) ………………………………………..……… 9

DC Code Section 7-2707.06(a) ………………………………………………… 12

DC Code Section 22-3571.01(b)(4) ………………………………………….…… 12

DC Code Section 22-4504(a) …………………..…………………..…………………… 5

DC Code Section 22-4506(a) ………………….…………………..…………………… 5

DCMR 24-2343.1 …………………………………..……………………..……. passim

DCMR 24-2343.2 …………………………………………………………...…… 10

DCMR 24-2344.1 …………………………………………………………...…… 9

Fed. R. Civ. P. 65(a) ……………………………………………..………... 26

Fed. R. Civ. P. 65(c) ……………………………………………..………... 24, 25

Militia Act of 1792 (May 8, 1792) ……………………………………………… 18

U.S. Const. Amend. II ……………………………………………………… passim

## Other authorities

1 A New and Complete Law Dictionary (1771) …………………………………..…… 3

1 Dictionary of the English Language 107 (4th ed.) …………………………………..……3

Ayoob, *5 Gun Fighting Myths Debunked by Massad Ayoob*, Personal Defense World (October 14, 2014), available at https://www.personaldefenseworld.com/2014/10/5-gunfighting-myths-debunked-massad-ayoob/ ………………………………………………………... 14, 15

Ayoob, *A Sad And Meaningful Anniversary*, Backwoods Home Magazine (April 11, 2016), available at https://www.backwoodshome.com/blogs/MassadAyoob/a-sad-and-meaningful-anniversary/ ………………………………………………………….. 16

Ayoob, *Lead and diamonds: the Richmond jewelry store shootout. (The Ayoob Files)* (2003), available at https://www.thefreelibrary.com/Lead+and+diamonds%3A+the+Richmond+jewelry+store+shootout.+(The+Ayoob...-a099130342 ……………………………………………… 17

Ayoob, *Shot 15 Times: The Brian Murphy Story*, American Handgunner (2018), available at https://americanhandgunner.com/our-experts/shot-15-times-the-brian-murphy-story/ ……..… 15

Concealed Carry Corner: Small Guns – The Good, The Bad and the Ugly, The Firearms Blog (November 19, 2019), available at https://www.thefirearmblog.com/blog/2019/11/21/concealed-carry-corner-micro-guns-the-get-to-my-gun-gun/ …………………………………….....… 12

FBI, *Officer Involved Shooting*, available at
https://info.publicintelligence.net/FBIAAROfficerShooting.pdf ................................. 15

Fitzpatrick, *The Best Concealed Carry Handguns in 2021,* American Firearms (January 29,
2021), available at https://www.americanfirearms.org/best-concealed-carry-guns/ …...…... 12, 13

Johnston, *Wolfpack-Multiple Assailants,* Police Law Enforcement Solutions (November 1,
1996), available at https://www.policemag.com/338649/wolf-pack-multiple-
assailants#:~:text=There%20is%20considerable%20empirical%20evidence%20to%20support%2
0the,can%20result%20in%20serious%20bodily%20injury%20or%av20death ……………….. 17

Mireles, *FBI Miami Firefight: Five Minutes that Changed the Bureau* (2017) ………………... 15

MPD General Order RAR-901.01 (June 12, 2008) …………………………………………... 18

MPD Response to FOIA Request, 2019-FOIA-05038 …………………………………………... 6

*Notice of Emergency and Proposed Rulemaking*,
   N0050304, 61 DRC 11519 (October 31, 2014) ………………………………....….. 10

*Notice of Final Rulemaking,*
   N0054222, 62 DCR 9781 (July 17, 2015) …………………………………………… 11

*Notice of Second Emergency And Proposed Rulemaking*,
   N0051986, 62 DCR 2803 (March 6, 2015) …………………………………………... 11

Purkiss, Locked Back*, Lessons from Jared Reston's Gun Fight – Shot 7 Times & Still Won*
(December 20, 2017), available at https://lockedback.com/lessons-jared-restons-gunfight-shot-7-
times-still-won/ ……………………………………………………………………………… 14

Ramirez, *DC residents trying to obtain concealed carry permits seeing lengthy delays*
(October 1, 2021), available at https://www.fox5dc.com/news/dc-residents-trying-to-obtain-
concealed-carry-permits-seeing-lengthy-delays ……………………………………………... 6

Reston, *Winning an Armed Encounter* (December 4, 2017), available at
https://www.youtube.com/watch?v=jIx0Y25aTfU ……………………………………………… 16

*Samson, 4 arrested, including 15-year-old, for brutal attack on Chinese PhD student near UW-*
*Madison,  Yahoo News (June 21, 2022), available at https://news.yahoo.com/4-arrested-*
*including-15-old-174154164.html?fr=sycsrp_catchall* ……………………………………….. 17

*Than, Gunshot Wound Head Trauma (undated), available at*
*https://www.aans.org/en/Patients/Neurosurgical-Conditions-and-Treatments/Gunshot-Wound-*
*Head-Trauma* ………………………………………………………………………………... 16

*Top Smallest Pistols on Brownells* (April 27, 2022), available at https://thegunzone.com/top-smallest-pistols-on-brownells/ ……………………………………………………………. 13

Wallace, *Shots Fired: Jared Reston Survival and Gear*, Recoil Magazine (December 6, 2019), available at https://www.recoilweb.com/shots-fired-jared-reston-survival-gear-154993.html ... 14

Willmus, *Why Shotguns Have Plugs (Plus the laws you need to know),* Backfire (November 3, 2021), available at https://backfire.tv/why-shotguns-have-plugs/#:~:text=Plugs%20are%20used%20in%20shotguns%20to%20limit%20the,varies%20depending%20on%20the%20gauge%20and%20magazine%20length ………………………. 19, 20

*Whitaker v. District of Columbia Concealed Pistol License Review Board,*
Case No. 21-1545, Petition for Writ of Certiorari (June 7, 2022) …………………………..……. 6

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DICK ANTHONY HELLER, et al.** | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 22-cv-1894 DRF |
| | ) |
| **DISTRICT OF COLUMBIA, et al.** | ) |
| | ) |
| Defendants. | ) |
| ——————————————————— | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION
FOR PRELIMINARY INJUNCTION**

Plaintiffs submit this Memorandum of Points and Authorities in Support of their application to preliminarily enjoin District of Columbia Municipal Regulation ("DCMR") 24-2343.1.

**I.      *Plaintiffs have standing to bring this action.***

To show standing, Plaintiffs must allege a concrete and particularized injury that is either actual or imminent. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). That injury must be both fairly traceable to the challenged action of the defendants and redressable by the court. *Id*. at 560-61. Individual Plaintiffs Heller and Nesby plainly meet this standard.

Plaintiffs here are suffering an immediate and continuing injury because the Defendants by enforcement of DCMR 24-2343.1 restrict the amount of ammunition they can carry on their person in exercising their right under the Second Amendment to carry handguns for personal protection within the District.

Plaintiffs Heller and Nesby have been issued licenses to carry handguns in public in the District pursuant to District law. *See* Exhibit 1 (Declaration of Dick Anthony Heller); Exhibit 2 (Declaration of Charles Nesby). However, DCMR 24-2343.1, adopted by the Chief of the

1

Metropolitan Police Department ("MPD"), restricts the amount of ammunition they can carry to that which would load their carry gun twice, but in no event more than 20 rounds. This limitation restricts the ability of Plaintiffs to exercise their Second Amendment right to carry a firearm for personal protection in a way that is not consistent with the nation's historical tradition. It is therefore invalid under the test the Supreme Court announced in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. __, Case No. 20-843, *slip op.* (June 23, 2022) (hereinafter "*Bruen*").

A decision by this court invalidating the District regulation in question and granting the relief requested in Plaintiffs' Complaint will redress the injury Plaintiffs are suffering as it will allow the Plaintiffs to carry the amount of ammunition they consider necessary and prudent to protect themselves from violent attack. Therefore, Plaintiffs have standing to bring this action.

## II.   *Plaintiffs are entitled to a preliminary injunction.*

A plaintiff seeking a preliminary injunction must establish four factors: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter v. National Resources Defense Fund,* 555 U.S. 7 (2008); *The Truth About Obama v. Federal Election Commission,* 575 F.3d 342 (4th Cir. 2009), remanded other grounds, 130 S.Ct. 237 (2010) (subsequent history omitted). *See also Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). Each of these factors supports grant of Plaintiffs' application for a preliminary injunction.

### A.   *Plaintiffs are likely to prevail on the merits.*

As we show below, Plaintiffs are likely to prevail on the merits of their claims because DCMR 24-2343.1 violates their Second Amendment rights.

##### 1.     *The Second Amendment.*

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

The Second Amendment protects the People's fundamental right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *Bruen*, slip op. (June 23, 2022); *District of Columbia v. Heller*, 554 U.S. 570 (2008) (hereinafter *"Heller")*; *McDonald v. Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts,* 577 U.S. 411 (2016) (hereinafter *"Caetono")*; *Wrenn v. District of Columbia,* 864 F.3d 650 (D.C. Cir. 2017) (hereinafter *"Wrenn"*); *Palmer v. District of Columbia,* 59 F.Supp.3d 173 (D.D.C 2014) (hereinafter "Palmer").

Arms are "'weapons of offence, or armour of defence.' 1 Dictionary of the English Language 107 (4th ed.). They are anything that a man [or woman] wears for his defense, or takes into his hands, or uses in wrath to cast at or strike another.' 1 A New and Complete Law Dictionary (1771)." *Heller*, 554 U.S. at 581.

The Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. *Heller,* 554 U.S. at 582; *Caetano*, 577 U.S. at 411.

Pursuant to the Supreme Court's decision in *Bruen, supra,* and the DC Circuit's decision in *Wrenn*, *supra,* the Second Amendment protects the right of law-abiding citizens to carry a handgun in public for self-protection. A necessary component of the right to carry a firearm is the right to possess and carry ammunition for that firearm. Otherwise, the firearm would be useless as a self-defense tool, other than as a clubbing weapon. *Cf. Ezell v. City of Chicago,* 651 F.3d 684,

704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use...").

Under the Second Amendment, the District of Columbia retains the ability presumptively to regulate consistent with the nation's historical tradition of firearms regulation, the manner of carrying arms, including handguns, and may prohibit certain arms in narrowly defined sensitive places, prohibit the carrying of arms that are not within the scope of Second Amendment's protection, such as unusually dangerous arms, and disqualify specific, particularly dangerous individuals from carrying arms. *Bruen, slip. op.* at 13-15. *See Heller,* 554 U.S. at 627; *Wrenn,* 864 F.3d at 662-63 & n. 5. However, when firearm regulations impinge on the ability of law-abiding persons to protect themselves and their loved ones, such laws are invalid unless supported by the text of the Second Amendment or by historical analogues existing at the time of the founding. *Bruen, slip op.* at 13-15.

Given the Supreme Court decisions in *Bruen* and *Heller*, The District of Columbia may not ban the keeping and bearing of arms for self-defense that are not unusually dangerous, deny individuals the right to carry arms in non-sensitive places, deprive individuals of the right to keep or carry arms in an arbitrary and capricious manner, or impose regulations on the right to keep and carry arms that are inconsistent with the Second Amendment and the historical tradition of firearms regulation in the United States. *Bruen, slip op.* at 13-15; *See Caetano*, 577 U.S. 411; *Heller v. District of Columbia,* 801 F.3d 264 (D.C. Cir. 2015); *Wrenn,* 864 F.3d 650; *Palmer,* 59 F.Supp.3d 173.

The regulation at issue in this case, DCMR 24-2343.1, runs afoul of the Second Amendment because it lacks any historical justification, is arbitrary and capricious, and unnecessarily impinges on the core right of self-protection. Moreover, to the extent there is any

continuing validity of the interest balancing test the D.C. Circuit adopted in *Heller v. District of Columbia,* 670 F.3d 1244 (D.C. Cir. 2011) – and we suggest there is none after *Bruen* – the regulation at issue herein is not justified by an articulated compelling or substantial governmental interest, and lacks sufficient tailoring to achieve whatever governmental interest, if any, might exist to otherwise support it.

### 2. *The statutory scheme.*

Following *Palmer's* issuance, the District of Columbia enacted a detailed scheme that restricted the carrying of handguns to persons who are issued licenses to carry concealed pistols.[1] *See* DC Code Section 22-4504(a) ("No person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon."). The MPD Chief was given discretion to issue carry licenses to persons who could show good cause and otherwise meet detailed eligibility requirements. *See* DC Code Section 22-4506(a), which provided:

> The Chief of the Metropolitan Police Department ("Chief") may, upon the application of a person having a bona fide residence or place of business within the District of Columbia, or of a person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his or her person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol concealed upon his or her person within the District of Columbia for not more than 2 years from the date of issue, if it appears that the applicant has good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol, and that he or she is a suitable person to be so licensed.

_____

[1] DC Code Section 7-2501.01(12) defines the term "pistol" as "any firearm originally designed to be fired by use of a single hand or with a barrel less than 12 inches in length." Generally in usage, the term "pistol" refers to a handgun having one chamber integral with the barrel, making pistols distinct from the other main type of handgun, the revolver, which has a revolving cylinder containing multiple chambers. Most handgun experts and dictionaries make a technical distinction that views pistols as a subset of handguns. Contrary to general usage, the District uses the term to refer to all handguns, however. For the sake of clarity, this complaint will use the term "handgun" to refer to both pistols, revolvers and other weapons coming within the term "pistols" as defined by DC law.

Under this provision, some 123 carry licenses were issued between the date of enactment of Section 22-4506(a), and the decision of the D.C. Circuit in *Wrenn*. Pursuant to *Wrenn*, the District became what is known as a shall issue jurisdiction, meaning that upon meeting objective qualifications criteria the MPD Chief was required to issue a license to carry a handgun to an applicant unless the Chief had information indicating the applicant was not a suitable person, such as presenting a danger to himself or others.[2] Such objective criteria includes meeting the requirement to take 16 hours of classroom training and two hours of range training from an MPD licensed concealed carry instructor, passing a 50 round shooting test administered by the instructor, passing a background check, and not being a person prohibited from possessing firearms and ammunition under federal or District law. *See* DC Code Section 7-2509.02.

Based upon MPD's response to a Freedom of Information Act request as of August 29, 2019, the District had issued 3,339 carry licenses. *See* MPD Response to FOIA Request, 2019-FOIA-05038. An October 2021 media report indicated MPD has granted close to 9,000 carry licenses. *See* Ramirez, *DC residents trying to obtain concealed carry permits seeing lengthy delays* (October 1, 2021), available at https://www.fox5dc.com/news/dc-residents-trying-to-obtain-concealed-carry-permits-seeing-lengthy-delays.

The District has adopted strict regulations on the carrying of handguns. For example, District law substantially limits the locations where handguns may be carried. *See* DC Code 7-2509.07. Quoting from Code Section 7-2509.07(a), handguns may not be carried in the following places or in the following circumstances:

---

[2] This discretion afforded the Chief by this provision has been subject to abuse. *See Whitaker v. District of Columbia Concealed Pistol License Review Board,* Case No. 21-1545, Petition for Writ of Certiorari (June 7, 2022).

**(1)** A building or office occupied by the District of Columbia, its agencies, or instrumentalities;

**(2)** The building and grounds, including any adjacent parking lot, of a childcare facility, preschool, public or private elementary or secondary school; or a public or private college or university;

**(3)** A hospital, or an office where medical or mental health services are the primary services provided;

**(4)** A penal institution, secure juvenile residential facility, or halfway house;

**(5)** A polling place while voting is occurring;

**(6)** A public transportation vehicle, including the Metrorail transit system and its stations;

**(7)** Any premises, or portion thereof, where alcohol is served, or sold and consumed on the premises, pursuant to a license issued under Title 25; provided, that this prohibition shall not apply to premises operating under a temporary license issued pursuant to § 25-115, a C/R, D/R, C/H, D/H or caterer license issued pursuant to § 25-113, or premises with small-sample tasting permits issued pursuant to § 25-118, unless otherwise prohibited pursuant to subsection (b)(3) of this section;

**(8)** A stadium or arena;

**(9)** A gathering or special event open to the public; provided, that no licensee shall be criminally prosecuted unless:

> **(A)** The organizer or the District has provided notice prohibiting the carrying of pistols in advance of the gathering or special event and by posted signage at the gathering or special event; or

> **(B)** The licensee has been ordered by a law enforcement officer to leave the area of the gathering or special event and the licensee has not complied with the order;

**(10)** The public memorials on the National Mall and along the Tidal Basin, and any area where firearms are prohibited under federal law or by a federal agency or entity, including U.S. Capitol buildings and grounds;

**(11)** The White House Complex and its grounds up to and including to the curb of the adjacent sidewalks touching the roadways of the area bounded by Constitution Avenue, N.W., 15th Street, N.W., H Street, N.W., and 17th Street, N.W.;

**(12)** The U.S. Naval Observatory and its fence line, including the area from the perimeter of its fence up to and including to the curb of the adjacent sidewalks touching the roadway of Observatory Circle, from Calvert Street, N.W., to Massachusetts Avenue, N.W., and around Observatory Circle to the far corner of Observatory Lane;

**(13)(A)** When a dignitary or high-ranking official of the United States or a state, local, or foreign government is moving under the protection of the MPD, the U.S. Secret Service, the U.S. Capitol Police, or other law enforcement agency assisting or working in concert with MPD, within an area designated by the Chief, the Chief of the U.S. Secret Service, or the Chief of the U.S. Capitol Police, or a designee of any of the foregoing, that does not include any point at a distance greater than 1,000 feet from the moving dignitary or high-ranking official; provided, that no licensee shall be criminally prosecuted unless:

> **(i)** The law enforcement agency provides notice of the designated area by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to make the designated area of protection obvious;

> **(ii)** The District or federal government has provided notice prohibiting the carrying of pistols along a designated route or in a designated area in advance of the event, if possible, and by posted signage along a route or in a designated area; or

> **(iii)** The licensee has been ordered by a law enforcement officer to leave the designated area and the licensee has not complied with the order.

**(B)** For the purposes of this paragraph, the term "moving" shall include any planned or unplanned stops, including temporary stops, in locations open to the public.

**(14)** When demonstration in a public place is occurring, within an area designated by the Chief or his or her designee, or other law enforcement agency, that does not include any point at a distance greater than 1,000 feet from the demonstration; provided, that no licensee shall be criminally prosecuted unless:

> **(A)** The law enforcement agency provides notice of the designated area by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to make the designated area of the demonstration obvious;

> **(B)** The District or federal government has provided notice prohibiting the carrying of pistols along or within a demonstration route or designated area in advance of the event, if possible, and by posted signage along a demonstration route or designated area; or

8

**(C)** The licensee has been ordered by a law enforcement officer to leave the designated area and the licensee has not complied with the order; …

**(15)** Any prohibited location or circumstance that the Chief determines by rule; provided, that for spontaneous circumstances, no criminal penalty shall apply unless the licensee has notice of the prohibition and has failed to comply.

In addition, D.C. Code Section 7-2509.07(b)(1) provides that carrying a handgun into the residence of another is presumed prohibited unless authorized in advance by the owner or person in control of the property. D.C. Code Section 7-2509.07(b)(1). A similar provision presumes that carrying a handgun into a house of worship is prohibited unless signage allows it, or the licensee is given permission personally in advance. DC Code Section 7-2509.07(b)(2). Under DC Code Section 7-2509.07(b)(3), it is presumed that a licensee has permission to carry in and on other non-residential property unless conspicuous signage prohibits handgun carry or the licensee has been personally told not to carry on the property.

These are so-called sensitive places regulations. In dicta, *Heller* designated schools and government building as presumptively sensitive areas where carrying of firearms could be restricted. *Heller,* 554 U.S. at 626. *See also Bruen, slip op.* at 26. In *U.S. v. Class,* 930 F.3d 460, 463 (D.C. Cir. 2019) the court noted that "A challenger may rebut this presumption by 'showing the regulation [has] more than a de minimis effect upon his right' to bear arms. *Heller[v. District of Columbia],* 670 F.3d [1244,] 1253 [D.C. Cir. 2011]."

The District requires that pistol carry licensees must carry their guns fully concealed. DCMR 24-2344.1 states: "A licensee shall carry any pistol in a manner that it is entirely hidden from view of the public when carried on or about a person, or when in a vehicle in such a way as it is entirely hidden from view of the public."

Moreover, pursuant to DC Code Section 7-2509.11(2), the MPD Chief was authorized to promulgate rules "To establish the type and amount of ammunition that may be carried concealed

by a licensee" holding a concealed pistol license. The Chief did so via DCMR 24-2343. DCMR 24-2343.2 prohibits the carrying of restricted pistol ammunition, otherwise known as armor piercing ammunition which is illegal to possess in the District. *See* DC Code Sections 7-2506.01(3) and 7-2501.01(13)(A)(A) (defining restricted pistol bullet). Plaintiffs do not challenge this regulation, DCMR 24-2343.2.

Plaintiffs do challenge DCMR 24-2343.1. As originally adopted via a *Notice of Emergency and Proposed Rulemaking ("Emergency Notice")* on October 31, 2014, this regulation provided, "A person issued a concealed carry license by the Chief, while carrying the pistol, shall not carry more ammunition than is required to render the pistol fully loaded, and in no event shall that amount be greater than ten (10) rounds of ammunition." *See* N0050304, 61 DRC 11519. The emergency regulation was adopted without any discussion of the substance of this particular regulation or justification of the limitations set forth therein.[3] Apparently, it was the arbitrary determination of the Chief.

---

[3] The Emergency Notice did state without specifically identifying that,

> [s]ome of the standards the Chief will use to consider license applications were established in the Act by the Council of the District of Columbia (Council). The Council derived the standards found in similar "may issue" handgun licensing or permitting schemes in the States of Maryland (good and substantial reason standard), New Jersey (justifiable need standard), and New York (proper cause standard). All of these schemes have been sustained as constitutional by U.S. Courts of Appeals. Additionally, some of the standards in these regulations have been adapted from the above states and earlier MPD regulations. Many of the application and investigation procedures were adapted from Maryland regulations.

As we discuss herein, neither New York, New Jersey nor Maryland law contains an analog to DCMR 24-2343.1. Indeed, it is apparent that DCMR 24-2343.1 has no analog among the laws of any state in the union nor does any historical analog exist to justify this regulation. As such, it fails Second Amendment scrutiny. *Bruen, slip op.* at 13-15.

Subsequently on March 6, 2015, the Chief issued a *Notice Of Second Emergency And Proposed Rulemaking*, N0051986, 62 DCR 2803, which without comment or explanation, doubled the allowable ammunition a concealed pistol licensee could carry on his person. This regulation read, "A person issued a concealed carry license by the Chief, while carrying the pistol, shall not carry more ammunition than is required to fully load the pistol twice, and in no event shall that amount be greater than twenty (20) rounds of ammunition."

The Chief adopted the final rule via a *Notice of Final Rulemaking*, N0054222, 62 DCR 9781, issued July 17, 2015, again without comment or explanation regarding DCMR 24-2343.1, which was unchanged from the second emergency proposed rulemaking.

>    *3*.   ***The challenged regulation lacks support from the nation's historical tradition of firearms regulation and is more than a de minimis burden on armed self-defense; it thus violates the Second Amendment.***

*Bruen, Heller* and *Wrenn* require us to evaluate firearms regulations in light of the text, history and tradition of the Second Amendment. *Bruen, slip op.* at 13-15; *Heller,* 554 U.S. at 576-628*; Wrenn,* 864 F.3d at 657-61. *See also Moore v. Madigan,* 702 F.3d 933, 935-37 (7th Cir. 2012), *reh'g en banc denied*, 708 F.3d 901 (7th Cir. 2013). There appears to be nothing in the text, history or tradition of the Second Amendment or the nation's historical tradition of firearms regulation that supports limiting the amount of ammunition a person may carry for his or her self-defense.

> ### a.     DCMR 24-2343.1 is a substantial burden on Plaintiffs' right of armed self-defense.

As stated above, District regulations require pistol carry licensees to carry their firearms fully concealed. Violation of this regulation is grounds for revocation of the carry license and carries a potential criminal penalty. *See* D.C. Code Section 7-2509.10(a)(1).[4]

Smaller, lower capacity handguns are substantially easier to conceal than larger, higher capacity handguns, especially for women who generally have differing clothing considerations than do men. *See generally, Concealed Carry Corner: Small Guns – The Good, The Bad and the Ugly,* The Firearms Blog (November 19, 2019), available at https://www.thefirearmblog.com/blog/2019/11/21/concealed-carry-corner-micro-guns-the-get-to-my-gun-gun/. Because of this, smaller handguns are popular among persons holding District concealed pistol licenses. *See* Declaration of MPD Licensed Firearm Instructor Mark A. Briley. Various manufacturers specifically market small pistols for the concealed carry community, Exhibit 3, hereto. *See also Top Smallest Pistols on Brownells* (April 27, 2022), available at https://thegunzone.com/top-smallest-pistols-on-brownells/;[5] Fitzpatrick, *The Best Concealed*

---

[4] The ramifications of violating the requirement that the firearm must be fully concealed are enormous. The District of Columbia Code provides for a potential jail term of up to six months and a fine of up to $1000 for such violation. *See* D.C. Code Sections 7-2707.06(a) and 22-3571.01(b)(4). Moreover, conviction "in any jurisdiction of any law which involves the sale, purchase, transfer in any manner, receipt, acquisition, possession, having under control, use, repair, manufacture, carrying, or transportation of any firearm, ammunition, or destructive device" is defined as a "weapons offense." D.C. Code Section 7-2501.01(18). Conviction of a weapons offense–with very minor exceptions not pertinent here–by a DC resident renders that person ineligible for life to register or carry a firearm, thus stripping him of his firearms rights in the District. *See* D.C. Code Section 7-2502.03(a)(2). Under such circumstances, no DC conceal carrier is likely to intentionally expose his firearm and risk losing his firearms rights in the District. We note that MPD actively enforces this provision.

[5] Among the firearms mentioned in the article are: the Kahr P380 with a capacity of 7 rounds, 6 in the magazine and 1 in the chamber; the Glock 42, 6+1 capacity; Colt Mustang, 6+1 capacity; M&P

*Carry Handguns in 2021,* American Firearms (January 29, 2021), available at https://www.americanfirearms.org/best-concealed-carry-guns/.[6]

The regulation here at issue limits a licensed concealed carrier to the amount of ammunition that would load his or her gun twice, but no more than 20 rounds total. The regulation at issue unduly burdens the self-defense rights of Plaintiffs and other persons possessing a District of Columbia concealed pistol license. The burden is particularly harsh as to persons like the Plaintiffs in this case, who choose to carry smaller, more concealable firearms which hold a small amount of ammunition by virtue of their small size. Nonetheless the even were the Plaintiffs carrying full-size pistol, the ammunition limit burdens the exercise of their Second Amendment right to armed self-defense.

There are two ways to stop a deadly force attack. The first is to persuade the attacker to stop. This could potentially be accomplished through verbal persuasion such as an appeal to morality and humanity; however, in the real world once someone has committed to the use of deadly force in the commission of a violent crime, he is not likely to be talked out of it. A more likely means of persuasion is the threat or application of deadly force in response. Hence, most crimes which are stopped by armed citizens do not require the firing of a single shot. Similarly, an assailant who has been shot at or hit may decide he has made a grievous error in the victim selection process and break off the attack.

_____

Shield, 8+1 capacity; Diamondback Arms DB380, 6+1 capacity; Kel-Tec PF-9, 7+1 capacity; Beretta Nano, 6+1 capacity; and Tauris 709FS, 7+1 capacity.

[6] In addition to many of the guns discussed in note 4, supra, the article mentions: the Ruger LCP II, 6+1 capacity; the Ruger LCR, a 5 shot revolver; the Smith & Wesson Airweight, also a 5 shot revolver; Walther PPK, 6+1 capacity; and PPK/s, 7+1 capacity.

13

Not all criminals, however, are persuadable. To stop those criminals, it is necessary to incapacitate them before they cause serious bodily harm or death. This can be done by causing sufficient trauma and blood loss so that the attacker loses the ability to inflict harm. Handgun bullets, however, are rather weak for this purpose as has been documented by numerous officer involved and civilian shootings.

For example, Jacksonville, Florida Police Officer Jared Reston fired 14 shots in attempting to defend against a shoplifter who tried to murder him. The assailant carried a .45 caliber handgun, which shoots one of the larger pistol rounds. The perpetrator shot Reston in the face and then proceeded to fire 11 more rounds at him, six of which struck Reston, who survived the gun fight. Reston managed to shoot the suspect seven times, ending the fight with a final shot to the head. *See* Wallace, *Shots Fired: Jared Reston Survival and Gear*, Recoil Magazine (December 6, 2019), available at https://www.recoilweb.com/shots-fired-jared-reston-survival-gear-154993.html. *See also* Purkiss, Locked Back*, Lessons from Jared Reston's Gun Fight – Shot 7 Times & Still Won* (December 20, 2017), available at https://lockedback.com/lessons-jared-restons-gunfight-shot-7-times-still-won/.

Noted police and civilian firearms instructor and frequent expert witness in the use of force Massad Ayoob illustrates this point with two shooting incidents, one involving a civilian and one involving a law enforcement officer:

> Famed Los Angeles watch shop owner Lance Thomas was involved in multiple gun battles with armed robbers, winning every one. In one of those incidents, he had to fire 19 rounds before the last of his multiple opponents was out of the fight. Some bad guys can soak up an unbelievable amount of lead, and the cunning ones run and use cover, making them harder to hit and requiring more shots to stop them.

> A municipal police sergeant in northern Illinois, Tim Gramins, comes to mind. He pulled over a heavily armed suspect who came out shooting, and the fight was on. In just under a minute, the perpetrator was finally down and dead. During that time, Gramins had fired 33 rounds from his Glock 21 pistol, reloaded as necessary and

14

> hit his opponent 14 times with 230-grain Gold Dot .45 bullets. Six of those hits were in what most of us would call "vital zones," but the fight wasn't over until Gramins finally had the opportunity for brain shots. During that fight the suspect had gone through two semi-automatic pistols himself and had fired 21 shots.

Ayoob, *5 Gun Fighting Myths Debunked by Massad Ayoob*, Personal Defense World (October 14, 2014), available at https://www.personaldefenseworld.com/2014/10/5-gunfighting-myths-debunked-massad-ayoob/.

Wisconsin police officer Brian Murphy was shot 15 time by a mass murdering white supremacist. Only three of those rounds were stopped by his body armor. Other shots hit him in the face, throat, both hands, both arms and both legs. Despite these grievous injuries, he survived. *See* Ayoob, *Shot 15 Times: The Brian Murphy Story*, American Handgunner (2018), available at https://americanhandgunner.com/our-experts/shot-15-times-the-brian-murphy-story/.

In commenting on another incident in which a suspect was shot 17 times with both .40 caliber 180 Gr. Gold Dot hollow point pistol rounds and .223 Hornady TAP rifle rounds and was still struggling with police as he was being handcuffed, a report by the FBI's Defensive Systems Unit – Ballistic Research Facility, FBI Academy, stated, "Determined individuals can sustain many gunshot wounds in areas that produce great pain and continue to fight a long time, even without the aid of drugs or alcohol. Shot placement is everything in a gunfight and always the key to stopping a threat effectively." FBI, *Officer Involved Shooting*, available at https://info.publicintelligence.net/FBIAAROfficerShooting.pdf. In that gun fight, two officers fired a total of 107 rounds. The suspect fired 26 rounds, reloading his magazine from a box of loose ammunition. *Id.*

Perhaps one of the more influential gun fights, which has since profoundly influenced doctrine on gun and ammunition selection, is the 1986 FBI Miami shootout. *See generally,* Mireles, *FBI Miami Firefight: Five Minutes that Changed the Bureau* (2017). In that incident two

bank robbers shot it out with a team of FBI agents. "Early in the fight, a bullet from [FBI agent Jerry] Dove's 9 mm pistol pierced the opposing rifleman's arm and into his chest, slicing an artery and inflicting a 'fatal, but not immediately neutralizing' hit when it stopped short of his heart. It was after that, that he [the bank robber] inflicted most of the deadly damage." Ayoob, *A Sad And Meaningful Anniversary*, Backwoods Home Magazine (April 11, 2016), available at https://www.backwoodshome.com/blogs/MassadAyoob/a-sad-and-meaningful-anniversary/.  The assailant would go on to take multiple hits from the agents' guns until Agent Edmundo Mireles killed him with a shot to the head. Two FBI agents died in that gun fight and five others were seriously wounded.

These various incidents and many others present the reality of firearms and ammunition count in self-defense. One can never know how many rounds are sufficient to stop a determined opponent. Even a shot in the face is no guarantee that it will incapacitate an opponent.[7] In a video presentation, Officer Reston explained that on his Jacksonville, Florida Department, he and two other officers had been shot in the face but went on to prevail against their assailants. *See* Reston, *Winning an Armed Encounter* (December 4, 2017), available at https://www.youtube.com/watch?v=jIx0Y25aTfU.

The Chief's rule imposes a severe and substantial infringement on the ability of Plaintiffs to use their preferred self-defense firearms for the lawful protection of themselves and others. This is especially the case in which a licensed conceal carrier may be set upon by multiple assailants as

---

[7] Head shots are generally considered to be fight stoppers because a shot to the brain likely will shut down the attacker. By definition, a head shot is a small target compared to a center mass shot and requires considerably more skill in a life-or-death situation. *See, e.g.,* Than, *Gunshot Wound Head Trauma* (undated), available at https://www.aans.org/en/Patients/Neurosurgical-Conditions-and-Treatments/Gunshot-Wound-Head-Trauma.

is often the case for residents of those neighborhoods in the District where gangs are prevalent. *See, e.g.,* Johnston, *Wolfpack-Multiple Assailants,* Police Law Enforcement Solutions (November 1, 1996), available at https://www.policemag.com/338649/wolf-pack-multiple-assailants#:~:text=There%20is%20considerable%20empirical%20evidence%20to%20support%20the,can%20result%20in%20serious%20bodily%20injury%20or%av20death. *See also* Samson, *4 arrested, including 15-year-old, for brutal attack on Chinese PhD student near UW-Madison*, Yahoo News (June 21, 2022), available at https://news.yahoo.com/4-arrested-including-15-old-174154164.html?fr=sycsrp_catchall; Ayoob, *Lead and diamonds: the Richmond jewelry store shootout. (The Ayoob Files)* (2003), available at https://www.thefreelibrary.com/Lead+and+diamonds%3A+the+Richmond+jewelry+store+shootout.+(The+Ayoob...-a099130342.

The District places Plaintiffs in the predicament of choosing smaller and typically less efficient handguns because of their concern with the requirement to fully conceal their handguns. But smaller guns are equally subject to the limit on ammunition. Plaintiff Heller is limited by DCMR 24-2343.1 to only 12 rounds for his six-shot revolver, six in his gun and another six to reload the gun one time. Plaintiff Nesby is limited to 14 rounds for his Springfield XDS, which is deemed subcompact by the firearms industry. By contrast, someone carrying a larger less concealable firearm such as a Glock 17, 19 or 26 may carry a total of 20 rounds. Plaintiffs can contemplate no rational basis why the capacity of ones gun should determine the amount of ammunition he or she can carry to protect his or her life. And of course, rational basis is not the test for the Constitutionality of restrictions on Second Amendment freedoms. *See Bruen, slip op.* at 13-15. The Chief's rule is simply arbitrary, as is the ultimate limit of 20 rounds which Plaintiffs Heller and Nesby cannot carry due to the limited capacity of their chosen concealable handguns.

17

We note that District police officers are mandated to carry 52 rounds in their Glock 17 pistols for their self-defense when on duty: one in the chamber, a full magazine of 17 rounds, and two additional full 17 round magazines.[8] What is good for MPD officers, however, is forbidden to the DC residents and out of state persons who hold DC concealed pistol license holders. *See* MPD General Order RAR-901.01 at 4 (June 12, 2008). Yet, DC concealed carry license holders have undergone rigorous training and background checks, which are among the more demanding requirements in the country. Further license holders, virtue of their conscientiousness choose these smaller handguns not for the sake of their own defense, but in an effort to fully comply with the District's laws.

>    **b.**     **DCMR 24-2343.1 lacks any foundation in the nation's historical tradition of firearms regulation.**

Plaintiffs are unaware of any founding era limitations on the amount of ammunition a person could carry to defend himself from an assailant. Certainly, the Chief pointed to no such traditional limit in prescribing a 20 round/one reload limitation in any of the proposed rulemakings or in the final rule adopting DCMR 24-2343.1.

What regulations did exist around the time of the founding of the Second Amendment required Americans to be armed and required militia members to be equipped with a *minimum* amount of ammunition. Section 1 of The Second Militia Act required,

>    That every citizen so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch with a box therein to contain not less than

---

[8] Unlike MPD officers, District carry license holders are limited to 10 round low-capacity magazines, rather than the standard capacity magazines that come stock with most semi-automatic pistols such as the Glock 17 (17 round capacity standard magazine) or the Glock 19 (15 round capacity standard magazine). This limitation raises grave Constitutional issues as well, but it is not the focus of this action. *But see Duncan v. Becerra,* 970 F.3d 1133 (9th Cir. 2020)*, vacated and reversed en banc* (Nov. 30, 2021)*, vacated and remanded sub nom, Duncan v. Bonta*, 597 U.S. __, Case No. 21-1194 (June 30, 2022).

> twenty-four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball: or with a good rifle, knapsack, shot-pouch and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder; and shall appear, so armed, accoutred and provided, when called out to exercise, or into service, except, that when called out on company days to exercise only, he may appear without a knapsack.

Militia Act of 1792 (May 8, 1792).

As the Supreme Court held in *Heller,* the militia consisted of able-bodied citizens capable of taking up arms to defend the nation. 554 U.S. at 580. Nothing appears to have limited a militia member from possessing more than the minimum amount of required ammunition. And nothing in the Militia Act purports to limit the amount of ammunition a militia member could carry outside of militia service. Beyond the Second Militia Act we are aware of no history or tradition of limiting the amount of ammunition that the people may carry for their self-defense. Certainly, the MPD Chief pointed to none in adopting the regulation in question.

Hunting regulations often restrict the number of shotgun shells or rifle rounds allowable in a firearm's magazine *when* the owner is hunting with the firearm. However, these are conservation regulations designed to prevent overhunting. As one commentator has explained it,

> At the behest of […] hunters, laws were passed to better regulate hunting in the United States. Laws created bag limits, possession limits, sectioned off certain plots of land as refuges for birds. This is also where we got laws banning the sale of wild game meat (if you have a source of venison that you purchase, it is from a farm.
>
> One set of game laws that rose out of that early movement was magazine capacity limits. The idea was that a recreational hunter would only kill one or two birds out of a flock, it wasn't considered sporting to blast dozens of ducks out of the water. Limiting shotguns to 10 gauge and smaller with only few shells played a big part in ending market hunting for birds.
>
> Many laws and hunting etiquette from those early days has carried over into the 21st Century. One such law is shotgun magazine capacity. In 1935 the first federal law restricting waterfowl hunters to three shots was enacted. As it happened, waterfowl populations began to rebound after an all-time low in the mid-30's.

19

Willmus, *Why Shotguns Have Plugs (Plus the laws you need to know),* Backfire (November 3, 2021), available at https://backfire.tv/why-shotguns-have-plugs/#:~:text=Plugs%20are%20used%20in%20shotguns%20to%20limit%20the,varies%20depending%20on%20the%20gauge%20and%20magazine%20length.

Plainly, these types of modern hunting regulations have no nexus to the Second Amendment's core protection of armed self-defense; nor are they of founding era vintage as *Bruen* requires. *See Bruen, slip op.* at 30 ("[W]hen it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.' *Heller*, 554 U.S., at 634-635.") Since no historical analog exists for limiting the amount of ammunition that can be carried for self-defense, the District's limitation as set forth in DCMR 24-2343.1 is categorically unconstitutional. *See Bruen, slip op.* at 67.

Further evidence that limiting the amount of ammunition one may carry to defend oneself and others is lacking in the nation's historical tradition of firearms regulation is that no other jurisdiction that we can find has imposed a regulation similar to that which the Chief has imposed on District pistol carry license holders. Thus, the outlier status of this regulation further demonstrates its Constitutional weakness. *See Bruen, slip op.* at 68; *Id.* at 78 & 79 (Kavanaugh, J., concurring). *See also Drummond v. Robinson Twp.,* No. 20-1722, 2021 U.S. App. LEXIS 24511, at *22 (3d Cir. Aug. 17, 2021).

In *Heller,* the Supreme Court eschewed balancing tests for evaluating the Constitutionality of regulations burdening the Second Amendment. *Heller,* 554 U.S. at 576-627. The just recently released *Bruen* decision makes it abundantly clear as to the Constitutional test for governmental restrictions on Second Amendment conduct, and the District cannot meet this test with respect to the regulation here at issue:

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Konigsberg [v. State Bar of California]*, 366 U.S., [36,] 50, n. 10 [(1961)].

*Bruen, slip op.* at 20 (2022).

Accordingly, it would be error for the Court to evaluate the regulation at issue under the means-end tiers of scrutiny approach *Bruen* rejects. *Id.* at 15. Nonetheless, the regulation at issue fails both strict scrutiny as well as the intermediate scrutiny test *Heller* specifically rejected. *See Heller,* 554 U.S. at 634. *See also Heller v. District of Columbia,* 670 F.3d at 1277 (Kavanaugh, J., dissenting). The MPD Chief pointed to no compelling or significant governmental interest in adopting the limitation on the amount of ammunition that may be carried by a licensed pistol carrier, and of course he set forth no discussion of potential alternative schemes to meet any such governmental interest which would be a lesser burden on Second Amendment rights. In any event, any such interest that the government could point to justify DCMR 24-2343.1 is outweighed by the burden it imposes on the Second Amendment right of self-defense. For these reasons even if means-ends scrutiny applied – and *Bruen* specifically says it does not – the challenged regulation cannot stand.

In light of the foregoing discussion, Plaintiffs clearly are likely to prevail on the merits in this action. No historical tradition exists of limiting the amount of ammunition a person may carry for his or her self-defense. In the absence of such a historical tradition, DCMR 24-2343.1 is unconstitutional. *Bruen, slip op.* at 13-15, 20.

**B.**    ***Plaintiffs will continue to suffer irreparable harm in the absence of preliminary relief.***

Having demonstrated that Plaintiffs are likely to prevail on the merits, we turn to whether Plaintiffs will suffer irreparable harm unless an injunction issues. *See Winter v. NRDC*, 555 U.S. at 22. The irreparable harm inquiry requires the court to assume Plaintiffs have demonstrated a likelihood of success on the merits and then to ask, "whether that violation, if true, inflicts irremediable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006) (hereinafter *"Chaplaincy"*). Plainly here Plaintiffs are suffering irreparable injury.

Where the defendant's actions violate the plaintiff's constitutional rights the requirement of "irreparable injury" is satisfied. As the D.C. Circuit has explained, "[s]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (brackets omitted) (hereinafter *"Gordon"*) (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)). Thus, "although a plaintiff seeking equitable relief must show a threat of substantial and immediate irreparable injury, a prospective violation of a constitutional right constitutes irreparable injury for these purposes." *Id.* (brackets omitted) (quoting *Davis*, 158 F.3d at 1346). *See also Berg v. Glen Cove City School District,* 853 F.Supp. 651 (E.D.N.Y. 1994); *Doe v. Shenandoah County School Board,* 737 F.Supp. 913 (W.D.Va. 1990); *Joynes v. Lancaster,* 553 F.Supp. (M.D.N.C. 1982).

The principle that the violation of a constitutional right by itself constitutes irreparable harm derives from the Supreme Court's decision in *Elrod v. Burns* that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 427 U.S. 347, 373 (1976). As the Seventh Circuit has explained in the context of a Second Amendment challenge:

> The loss of a First Amendment right is frequently presumed to cause irreparable harm based on the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future.

*Ezell v. City of Chicago*, 651 F.3d at 699 (internal quotation marks omitted). The Second Amendment also protects "intangible and unquantifiable interests." *Id*. Indeed, its "central component is the right to possess [arms] for protection," and violations of that right plainly "cannot be compensated by damages." *Id*. Thus, for violations of Second Amendment rights, as for violations of First Amendment rights, "irreparable harm is presumed." *Id*.

For these reasons, law-abiding citizens like Plaintiffs suffer irreparable harm each day they are subjected to the restrictions of DCMR 24-2343.1. The allegation of the violation, without more, satisfies the irreparable injury requirement. Even if Plaintiffs were required to establish a likelihood that the defendants' ammunition restriction will "chill" their exercise of constitutionally protected conduct, *see Chaplaincy*, 454 F.3d at 299, they have satisfied this requirement by declaring that, but for the challenged regulations, they would regularly carry an amount of ammunition in excess of that which is allowed by DCMR 24-2343.1 *See* Exhibits 1-2.

Each day that the unconstitutional regulation continues in force, Plaintiffs risk physical injury because they are unable to fully exercise their Second Amendment right to self-defense using arms and an amount of ammunition of their choice. Of course, that injury cannot be compensated adequately through money damages. *See Ezell*, 651 F.3d at 699. For example, each day DCMR 24-2343.1 remains in effect, Plaintiffs lack the security of knowing they have available an effective self-defense tool with sufficient ammunition to handle assault by multiple assailants.

### C.  The balance of equities tips overwhelmingly in Plaintiffs' favor.

The equities weigh strongly in Plaintiffs' favor. Plaintiffs continue to suffer an ongoing violation of their constitutional rights, and this ongoing violation constitutes irreparable injury.

23

The Chief failed to articulate any interest in promulgating DCMR 24-2343.1. Any interest the District may have in enforcing this regulation is entirely speculative. Moreover, the Second Amendment itself is the product of interest balancing by the People and leaves no room for the third branch of government to determine whether the rights it protects are "*really* worth insisting upon." *Heller,* 554 U.S. at 634 (emphasis in original).

### D.    An injunction is in the public interest.

For similar reasons, an injunction is also in the public interest. The courts have acknowledged the "obvious" fact that "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon*, 721 F.3d at 653; *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013) ("[T]he enforcement of an unconstitutional law vindicates no public interest."). Because enforcement of DCMR 24-2343.1 is by definition contrary to the public interest, the entry of a preliminary injunction serves the public interest as a matter of law. Moreover, the analysis with respect to the balancing of the equities indicates that the public interest is served by vindicating citizens' constitutional rights and affording them an opportunity effectively to defend themselves from attack, not by perpetuating an unconstitutional and ineffective restriction on that right.

### III.    The Court should waive the bond requirement or set a nominal bond because Defendants will suffer no harm from a preliminary injunction.

Plaintiffs request the court set the bond amount at zero. Federal Rule of Civil Procedure 65(c) provides in relevant part:

> Security. No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

The court has the discretion to set the bond amount "in such sum as the court deems proper." Fed. R. Civ. P. 65(c). Consequently, the district court may set the bond amount at zero or a nominal amount "[w]here [it] determines that the risk of harm is remote, or that the circumstances otherwise warrant it. *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 41 1, 421, n.3 (4th Cir. 1999) (remanding case to district court for determination of appropriate bond amount).

Courts have set a nominal bond or waived the requirement altogether where, for example:

(l) the risk of harm to the defendant is remote or nonexistent, *SEC v. Dowdell*, Civil No. 3:01 cv 00116, 2002 U.S. Dist. LEXIS 19980 at (W.D. Va., Oct. 11, 2002) (setting nominal $100.00 bond after concluding that the risk of harm to the defendants was minimal);

(2)     the plaintiff has made a strong showing of likelihood of success on the merits, *Ark. Best corp. v. Carolina Freight Corp.*, 60 F.Supp.2d 517, 518 (W.D.N.C. 1999) (requiring nominal $100.00 security bond where plaintiffs made a strong showing of likelihood of success on the merits);

(3)     the balance of hardships weighs overwhelmingly in favor of the plaintiff, *Temple Univ. v. White*, 941 F.2d 201 (3d Cir. 1991), *cert. denied*, 502 U.S. 1032 (1992) (requiring no bond in non-commercial case where the balance of hardships that each party would suffer as the result of a preliminary injunction weighs overwhelmingly in favor of the party seeking the injunction); and

(4)     the case involves enforcement of a public interest, *Pharm. Soc. of the State of N. Y., Inc. v. N. Y. State Dep 't of Soc Servs.*, 50 F.3d 1 168, 1 174 (2d Cir. 1995) (concluding that "an exception to the bond requirement has been crafted for cases involving the enforcement of public interests arising out of 'comprehensive federal health and welfare statutes'"); *Westfield High Sch. L.I.F.E. Club v. City of Westfield*, 249 F. Supp.2d 98, 128, 129 (D. Mass. 2003) (waiving bond

requirement where plaintiffs submitted affidavits indicating their financial inability to post a security bond and where plaintiffs were seeking to preserve their rights to free expression and free exercise of religion).

Plaintiffs request the court set the bond requirement at zero because Defendants cannot demonstrate they will suffer any harm from grant of a preliminary injunction. This is a civil rights case, not commercial litigation. Even if Defendants were ultimately to prevail here, they would suffer no monetary damage. Indeed, by not enforcing the ordinances at issue, Defendants would avoid otherwise necessary public expenditure. In fact, Plaintiffs have demonstrated they will suffer irreparable harm if preliminary relief is not granted. The bond requirement should be waived because Plaintiffs' enforcement of important constitutional rights serves the public interest. *See Westfield High Sch. L.I. F. E. Club,* 249 F.Supp.2d at 129 (waiving bond requirement after concluding that plaintiffs' suit to enforce their right to freedom of expression and free exercise of religion served the public interest). For these reasons, Plaintiffs respectfully request the court set the bond amount at zero.

## IV.    *The court should enter final judgment for Plaintiffs.*

The Federal Rules of Civil Procedure permit this court to "advance the trial on the merits and consolidate it with the hearing" for a preliminary injunction. Fed. R. Civ. P. 65(a)(2). "[W]hen the eventual outcome on the merits is plain at the preliminary injunction stage, the judge should, after due notice to the parties, merge the stages and enter a final judgment." *Morris v. District of Columbia,* 38 F.Supp.3d 57, 62 n.1 (D.D.C. 2014) (quoting *Curtis 1000, Inc. v. Suess,* 24 F.3d 941, 945 (7th Cir. 1994)). The D.C. Circuit employed this procedure in *Wrenn. See* 864 F.3d at 667.

Plaintiffs suggest that unless the District can make an adequate showing of the need to develop a factual record to support the provisions at issue *and* that the regulation is supported by the nation's historical tradition of firearms regulation, a permanent injunction is appropriate now. In that regard the court should require the District to identify the specific areas appropriate for discovery and resolution at trial. In the absence of such issues, the final outcome of this case will not depend on any facts presented at trial, and no "genuine uncertainty [exists] at the preliminary injunction stage concerning what that outcome will be." *See Curtis 1000*, 24 F.3d at 945.

Plaintiffs suggest that at this preliminary injunction stage, the court will have all the facts it needs and only questions of law will remain for resolution. As in *Moore v. Madigan,* "[t]he constitutionality of the challenged statutory provisions does not present factual questions for determination in a trial." 702 F.3d at 942. To the extent any questions of disputed material fact exists, those questions involve only "legislative facts" that bear on the justification for legislation, not "adjudicative facts" that must be determined at trial. *Id.*

The Seventh Circuit's disposition in *Moore*, involving Illinois's complete ban on carrying firearms for personal protection, is particularly instructive here, as that court remanded for entry of a declaration of unconstitutionality and a permanent injunction upon reversing the district court's judgment granting Illinois's motion to dismiss. *See Moore*, 702 F.3d at 942. Likewise, here the court will have all the information it needs to make a final judgment upon conclusion of the preliminary injunction proceedings. The court should enter final judgment and put an end to the District's limitation on the amount of ammunition a concealed carry license holder may carry on his person.

27

## V.    *Conclusion.*

Plaintiffs have shown they are likely to prevail on the merits of this action. They have shown they suffer irremediable harm from DCMR 24-2343.1. They have shown the balance of equities weighs in their favor. They have shown that the public interest favors granting an injunction. And they have shown that they are entitled to a permanent injunction now. For the foregoing reasons, the court should preliminarily and permanently enjoin the defendants from enforcing DCMR 24-2343.1.

Respectfully submitted

**DICK ANTHONY HELLER**

**CHARLES NESBY**

**HELLER FOUNDATION**

By: /s/ George L. Lyon, Jr.
George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
1929 Biltmore Street NW
Washington, DC 20009
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com

*Attorneys for Plaintiffs*

Dated:   July 11, 2022

28

### CERTIFICATE OF SERVICE

I, George L. Lyon, Jr., a member of the bar of this court, certify that I served the foregoing document on all counsel of record for defendants through the court's ECF system, this 11th day of July, 2022.

/s/ George L. Lyon, Jr., DC Bar 388678